# United States Tax Court

T.C. Memo. 2025-20

WILLIAM J. CADE AND MARY E. CADE,
Petitioners

v.

COMMISSIONER OF INTERNAL REVENUE,
Respondent

————

Docket No. 7723-23L.                    Filed March 10, 2025.

————

*David L. Evans*, for petitioners.

*William J. Winspear* and *John M. Janusz*, for respondent.

## MEMORANDUM OPINION

LAUBER, *Judge*:  In this collection due process (CDP) case petitioners challenge their underlying tax liability for 2019.  They filed a return reporting a liability of $293,822, which they did not fully pay.  The Internal Revenue Service (IRS or respondent) commenced collection action, and they sought a CDP hearing under sections 6320 and 6330.[1]

During the hearing petitioners contended that they were entitled for 2019 to a charitable contribution deduction of $284,553 for donating tangible personal property to a charity.  Petitioners had allegedly overlooked this deduction when filing their original return.  Allowance of this deduction, they contended, would eliminate the assessed liability and entitle them to a refund.  Following conclusion of the hearing the

---

[1] Unless otherwise indicated, statutory references are to the Internal Revenue Code, Title 26 U.S.C., in effect at all relevant times, regulation references are to the Code of Federal Regulations, Title 26 (Treas. Reg.), in effect at all relevant times, and Rule references are to the Tax Court Rules of Practice and Procedure.  We round monetary amounts to the nearest dollar.

[*2] IRS issued a Notice of Determination upholding denial of the deduction and sustaining the collection action.

For contributions of property for which a deduction greater than $5,000 is claimed, the taxpayer must "obtain[] a qualified appraisal of such property." § 170(f)(11)(C). We agree with respondent that petitioners failed to obtain qualified appraisals for their gifts—indeed, they failed to secure in timely fashion any appraisal at all. We will accordingly grant respondent's Motion for Summary Judgment to the extent set forth below.

## *Background*

The following facts are derived from the pleadings, the parties' Motion papers, and the certified administrative record of the CDP proceeding. These facts are stated solely for the purpose of deciding respondent's Motion and not as findings of fact in this case. *See Sundstrand Corp. v. Commissioner*, 98 T.C. 518, 520 (1992), *aff'd*, 17 F.3d 965 (7th Cir. 1994). Petitioners resided in Florida when they timely petitioned this Court.

## I. *Petitioners' Unpaid Tax Liability*

Petitioners timely filed a 2019 Form 1040, U.S. Individual Income Tax Return. This return reported a tax liability of $293,822, total payments of $210,000, an estimated tax penalty of $5,191, and a balance due of $89,013. Petitioners did not enclose any payment with the return.

On November 9, 2020, the IRS assessed the tax shown as due and took action to collect the unpaid tax. On May 27, 2021, the IRS filed a Notice of Federal Tax Lien (NFTL) for 2019 and notified petitioners of their right to a hearing under section 6320. The NFTL reflected an unpaid 2019 tax liability of $91,497 at that time.[2]

---

[2] The NFTL also reflected a small tax liability for 2018, which was fully discharged by payments in October 2023 and March 2024. Petitioners did not dispute the collection action for 2018 during the CDP hearing; they did not address the 2018 tax year in their Petition; and they have advanced no argument regarding the 2018 year in any subsequent filing with this Court. There appears to be no live case or controversy regarding collection action for 2018; in any event, we find that petitioners have waived any such challenge.

**[*3]**    Petitioners timely filed Form 12153, Request for a Collection Due Process or Equivalent Hearing.[3]  The sole contention advanced in their hearing request was that they had filed a 2019 Form 1040–X, Amended U.S. Individual Income Tax Return, reporting a previously unclaimed charitable contribution deduction.  Allowance of this deduction, they contended, would eliminate their tax liability for 2019 and entitle them to a refund.  Because their underlying income tax liability for 2019 had assertedly been satisfied, they urged that the NFTL filing should be withdrawn.

II.    *Petitioners' Amended Return*

Petitioners' Form 1040–X for 2019 was dated October 16, 2020, and received by the IRS four days later.  It reported a noncash charitable contribution deduction of $284,553.  All the items were allegedly contributed on December 3, 2019, to the Victory Christian Church in Albany, New York.  The property contributed allegedly consisted of "surplus items" that petitioners did not need in their real estate business.  The items fell into the following three categories:

- Petitioners claimed a deduction of $146,043 for the donation of personal clothing items.  These items allegedly consisted of 2,253 "spring jackets" and 1,212 "short sleeve coveralls."  Petitioners reportedly acquired these items in June 2015 at a cost of $2,250.  As of December 2019, they asserted that the "spring jackets" were worth $39 apiece (for a total of $87,867) and that the "short sleeve coveralls" were worth $48 apiece (for a total of $58,176).

- Petitioners claimed a deduction of $89,100 for the donation of 16,200 "granite cobblestones of various sizes."  Petitioners reportedly acquired these items in May 2013 at a total cost of $1,000.  As of December 2019, they asserted that the 16,200 cobblestones were worth $5.50 apiece (for a total of $89,100).

- Petitioners claimed a deduction of $49,410 for the donation of 9,608 pieces of commercial vinyl tile and 10 four-gallon tubs of floor-tile adhesive. Petitioners reportedly acquired these items in January 2016 at a cost of $1,080.  As of December 2019, they asserted that the vinyl tile was worth $4.75 per square foot (for a

---

[3] Although the Form 12153 was received by the IRS six days after the filing deadline, the IRS Independent Office of Appeals (Appeals) determined that the request was timely "based on the postmark date."

[*4]    total of $45,638) and that the adhesive was worth $435 per tub (for a total of $4,350).

For each category of contributions, petitioners attached to their amended return a separate Form 8283, Noncash Charitable Contributions. Section B, Part III of this Form is captioned "Declaration of Appraiser." For the clothing items, the declaration was signed by Anthony Poutré, who listed his title as "former owner, army store." For the cobblestones, the declaration was signed by John Mauro, who listed his title as "member." For the vinyl tile and adhesive, the declaration was signed by Lee Evans, who listed his title as "operations supervisor." Lee Evans is the son of David L. Evans, who represented petitioners during the CDP proceeding and represents them in this Court.

Section B, Part IV of Form 8283 is captioned "Donee Acknowledgment." The acknowledgment on each Form was ostensibly executed on December 3, 2019, by a representative of Victory Christian Church. The Church's address was shown as 118 Quail Street, Albany, New York 12206. The signature on each Form is illegible. The documents list the signatory's title as "pastor," but none of the documents indicates that person's name.

III.    *The CDP Proceeding*

The CDP case was assigned to Appeals Officer (AO) Matthews in Tampa, Florida. He advised petitioners' counsel that their amended return for 2019 "was currently being considered by Examination and that Appeals will make the final determination on the matter if the amended return is not accepted."

The Examination Division requested copies of a contemporaneous written acknowledgment (CWA) of the gifts from Victory Christian Church and copies of "qualified appraisals" for the donated items. Petitioners supplied none of these documents. Instead, petitioners' counsel sent the Examination Division copies of the three Forms 8283, stating that "[t]he forms are acknowledged by the receiving charity and signed by the appraiser of the respective gifted property." The Examination Division already had the Forms 8283 in its possession because they were attached to the amended return.

In April 2022 AO Matthews received a copy of Examination Letter 569–B, which concluded that petitioners' charitable contribution deduction should be disallowed for lack of proper verification. He forwarded that document to Examination Appeals Officer (EAO) Levy "for her

[*5] determination on whether the decision to reject the 2019 amended return was correct or not." EAO Levy conferred with petitioners' counsel in October 2022 and again requested documentation to verify the claimed deduction. The documentation she requested included a CWA for the gifts from Victory Christian Church, copies of "qualified appraisals" for the donated items, and information to establish that the appraisers were "qualified."

In response petitioners' counsel took the position "that the Form 8283 serves as a CWA." With respect to qualified appraisals, he contended "that a Form 8283 was sufficient" and that "no other documentation needed to be provided." AO Matthews replied that "the Form 8283 is an appraisal summary only" and that a distinct "qualified appraisal" is required for any gift of property valued in excess of $5,000.

At no point during the CDP proceeding did petitioners supply an appraisal—for any of the items allegedly donated—that was prepared before October 16, 2020, the date on which the amended return was submitted. In January 2023 petitioners' counsel sent AO Matthews signed statements from the supposed appraisers dated January 5 and 6, 2023. In these documents—each of which was a page and a half long—Messrs. Poutré, Mauro, and Evans recited their job experience and stated their opinions as to the "wholesale value" of the donated items.

In response to AO Matthews's repeated requests for a CWA, petitioners' counsel finally supplied, on January 9, 2023, an alleged receipt from Victory Christian Church for the donated goods. This document, ostensibly dated December 3, 2019, shows the Church's address as 1312 Central Avenue, Colonie, New York 12205. The receipt lists the three categories of items contributed and states that "[n]o goods or services were provided to the donor in return for donor's contribution." The signature is illegible, and the document does not indicate the signatory's name or title.

On January 28, 2023, AO Matthews advised petitioners' counsel that EAO Levy had declined to change her recommendation after reviewing this additional information. AO Matthews offered to allow (subject to managerial approval) charitable contribution deductions corresponding to the cost bases reported for the items on the Forms 8283. Petitioners' counsel declined that offer, stated that petitioners desired no collection alternative, and requested that the IRS issue a Notice of Determination.

**[\*6]**    On April 17, 2023, the IRS issued the Notice of Determination sustaining disallowance of the $284,553 charitable contribution deduction and upholding the NFTL filing for 2019.  The Notice concluded that petitioners had not satisfied the statutory verification requirements for noncash contributions valued in excess of $5,000 because (1) they failed to secure an adequate CWA from the alleged donee; (2) they failed to secure "qualified appraisals" for any of the items contributed; and (3) they failed to establish that the individuals who signed the Forms 8283 were "qualified appraisers."

IV.    *Tax Court Proceedings*

Petitioners timely petitioned this Court on May 16, 2023.  The sole argument advanced in their Petition was that the IRS erred in disallowing a charitable contribution deduction of $284,553 for 2019.  If that deduction were allowed, they contended, they would have no underlying tax liability for that year and would be entitled to a refund.

On October 26, 2023, respondent filed a Motion to Remand the case to Appeals for a supplemental hearing.  The premise for the remand was that petitioners may have had a prior opportunity to dispute their 2019 tax liability upon receipt of a levy notice for that year.  The levy notice was issued in April 2021.  If petitioners received that notice and failed to request a CDP hearing in response thereto, they would arguably have forfeited the right to challenge their underlying liability at the CDP hearing convened with respect to the lien notice issued subsequently.  *See* § 6330(c)(2)(B) (permitting an underlying liability challenge if the taxpayer "did not receive any statutory notice of deficiency for such tax liability or did not otherwise have an opportunity to dispute such tax liability"); Treas. Reg. § 301.6320-1(e)(3), Q&A-E7.

By Order served November 28, 2023, as clarified on January 25, 2024, we granted respondent's Motion and remanded the case to Appeals.  A supplemental hearing was held in February 2024.  In a Supplemental Notice of Determination issued on March 27, 2024, Appeals determined that "petitioners' request to challenge the liability [for] tax period 12/31/2019 was properly considered and they were not precluded from challenging the liability."

As the Supplemental Notice explained, the IRS in April 2021 did issue a levy notice for 2019, but "Appeals was not able to confirm [petitioners'] receipt of [that] notice."  To the contrary, information in IRS files indicated that the April 2021 levy notice "was not delivered or

[*7] picked up by the taxpayer at the post office and is being returned to the post office." And no Statutory Notice of Deficiency (SNOD) was issued to petitioners for the liability reported on their 2019 return "because it was a self-assessed liability and no SNOD is required for a self-assessed liability." Appeals accordingly reaffirmed its conclusion that petitioners "are not precluded from challenging the [2019] liability," while adhering to its determination that the charitable contribution deduction had been properly denied.[4]

On December 18, 2024, respondent filed a Motion for Summary Judgment. He contends that the claimed deduction was properly disallowed, as a matter of law, because petitioners failed in several respects to satisfy the statutory verification requirements for noncash charitable contributions. Petitioners urge that they complied with these requirements. In the alternative they contend that any failure to comply was not fatal to allowance of a deduction because such failure was "due to reasonable cause and not to willful neglect." *See* § 170(f)(11)(A)(ii)(II).

## *Discussion*

### I.    *Summary Judgment Standard*

The purpose of summary judgment is to expedite litigation and avoid costly, unnecessary, and time-consuming trials. *See FPL Grp., Inc. & Subs. v. Commissioner*, 116 T.C. 73, 74 (2001). We may grant summary judgment regarding an issue as to which there is no genuine dispute of material fact and the movant is entitled to judgment as a matter of law. *See* Rule 121(a)(2); *Sundstrand Corp.*, 98 T.C. at 520. In deciding whether to grant summary judgment, we construe factual materials and inferences drawn from them in the light most favorable to the nonmoving party. *Sundstrand Corp.*, 98 T.C. at 520. But where the moving party makes and properly supports a motion for summary judgment, "the nonmovant may not rest on the allegations or denials in that

---

[4] The Supplemental Notice pointed out that the IRS had made an additional assessment for 2019, with respect to unreported dividend income of $40,809, after the CDP hearing was initiated. A Notice of Deficiency for that liability was issued to petitioners, who did not challenge the additional assessment. As Appeals explained, that Notice of Deficiency was issued "for an unrelated matter" more than a year after petitioners had requested the CDP hearing. Because the Notice of Deficiency was issued *after* petitioners had initiated the CDP hearing involved here, the Notice did not offer them a prior opportunity to dispute the self-assessed liability reported on their 2019 return. *See* § 6330(c)(2)(B).

**[\*8]** party's pleading" but must set forth specific facts, by affidavit or otherwise, showing that there is a genuine dispute for trial. Rule 121(d).

## II. *Standard of Review*

Sections 6320(c) and 6330(d)(1) do not prescribe the standard of review this Court should apply in reviewing an IRS administrative determination in a CDP case. The general parameters for such review are marked out by our precedents. Where the validity of a taxpayer's underlying liability is properly at issue, we review the IRS determination de novo. *Goza v. Commissioner*, 114 T.C. 176, 181–82 (2000). Where the taxpayer's underlying liability is not properly at issue, we review the IRS decision for abuse of discretion only. *See id.* at 182.

A taxpayer may challenge his underlying liability at a CDP hearing if he did not receive a statutory Notice of Deficiency or did not otherwise have a prior opportunity to dispute the liability. § 6330(c)(2)(B). As noted above, Appeals determined, and respondent agrees, that petitioners during the CDP hearing were entitled to dispute the self-reported liability shown their 2019 return. *See supra* pp. 6–7 & note 4. Petitioners' challenge to that liability, premised on their alleged entitlement to a charitable contribution deduction, is thus properly before this Court.[5]

## III. *Analysis*

Section 170(f) sets forth a series of substantiation requirements that vary depending on the character and size of the taxpayer's charitable gift. For gifts of $250 or more, section 170(f)(8)(A) requires that the taxpayer secure a CWA from the donee organization and maintain that document in his files. Additional verification requirements are imposed for contributions of property with a claimed value exceeding $500. *See* § 170(f)(11)(B). Still more rigorous verification requirements, including the need for a "qualified appraisal," are imposed for contributions of property with a claimed value exceeding $5,000. § 170(f)(11)(C).

For purposes of the instant Motion, respondent does not contest the existence of the alleged donations or the valuations placed upon them. Rather, he contends that no deduction is available, as a matter

---

[5] Petitioners informed AO Matthews that they did not desire a collection alternative, and their Petition did not allege that he abused his discretion in sustaining the NFTL filing (apart from contending that they were entitled to a charitable contribution deduction). We thus confine our attention to petitioners' underlying liability challenge.

**[\*9]** of law, because petitioners failed to satisfy the verification requirements listed above. We consider those requirements in turn.

A.   *CWA*

Section 170(f)(8)(A) provides that an individual may deduct a gift of $250 or more only if he substantiates the deduction with "a contemporaneous written acknowledgment of the contribution by the donee organization." *See Weyts v. Commissioner*, T.C. Memo. 2003-68, 85 T.C.M. (CCH) 999, 1002 (discussing legislative history of this provision). A CWA must include (among other things) a statement of "[w]hether the donee organization provided any goods or services in consideration, in whole or in part, for any [donated] property." § 170(f)(8)(B)(ii); *see* Treas. Reg. § 1.170A-13(f)(2). If the services the donee provides consist solely of intangible religious benefits, the CWA must include a statement to that effect. Treas. Reg. § 1.170A-13(f)(2)(iv).

An acknowledgment is "contemporaneous" if the taxpayer obtains it on or before the earlier of (1) the date the taxpayer files his original return for the year of contribution or (2) the due date, including extensions, for filing the taxpayer's original return. § 170(f)(8)(C); *see* Treas. Reg. § 1.170-13(f)(3). The statute explicitly provides that "[n]o deduction shall be allowed" in the absence of a CWA meeting the statutory requirements. § 170(f)(8)(A). "The deterrence value of section 170(f)(8)'s total denial of a deduction comports with the effective administration of a self-assessment and self-reporting system." *Addis v. Commissioner*, 374 F.3d 881, 887 (9th Cir. 2004), *aff'g* 118 T.C. 528 (2002); *Viralam v. Commissioner*, 136 T.C. 151, 171 (2011) (quoting *Addis v. Commissioner*, 374 F.3d at 887).

During the first 11 months of the CDP proceeding, petitioners took the position "that the Form 8283 serves as a CWA." That argument does not hold water. Congress has required that a CWA must include a statement of "[w]hether the donee organization provided any goods or services in consideration" for the gift. § 170(f)(8)(B). The Forms 8283 contain no statement to that effect. They therefore cannot serve as a CWA. *See 15 W. 17th St. LLC v. Commissioner*, 147 T.C. 557, 562 (2016) (stating that no deduction is permitted unless the CWA meets the strict substantiation requirements of section 170(f)(8)(B)); *French v. Commissioner*, T.C. Memo. 2016-53, 111 T.C.M. (CCH) 1241, 1242 (same).

In January 2023 petitioners finally supplied what purported to be an actual receipt from Victory Christian Church, ostensibly dated

**[\*10]** December 3, 2019.  But the timing of this submission arouses suspicion.  The Examination Division, AO Matthews, and EAO Levy had been requesting a copy of the CWA for many months.  If petitioners or their return preparer had this document in their files, it seems odd that it was not provided sooner.

The receipt has other questionable features.  It lists the three categories of items contributed and states that "[n]o goods or services were provided to the donor in return for donor's contribution."  But the signature is illegible, and the document does not indicate the signatory's name or title.

The receipt is dated December 3, 2019, the same date that appears in the "Donee Acknowledgment" in Section B, Part IV of each Form 8283.  But the address shown for the Church on the two documents is different.  The Form 8283 lists the Church's address as 118 Quail Street, Albany, New York 12206.  The receipt lists the Church's address as 1312 Central Avenue, Colonie, New York 12205.  And while the signatures on the respective documents are both illegible, they appear to be different signatures.  Given that the documents were ostensibly executed on the same day, these seeming discrepancies require explanation.

In short, there may be questions about the authorship and authenticity of the putative CWA that petitioners supplied to AO Matthews in January 2023.  But those are factual questions ill-suited to resolution by summary judgment.  We will accordingly deny respondent's Motion to the extent it is predicted on petitioners' alleged failure to secure a CWA.

B.     *Qualified Appraisal*

Section 170(f)(11)(E)(i) provides:

The term "qualified appraisal" means, with respect to any property, an appraisal of such property which—
> (I) is treated for purposes of this paragraph as a qualified appraisal under regulations or other guidance prescribed by the Secretary, and
> (II) is conducted by a qualified appraiser in accordance with generally accepted appraisal standards and any regulations or other guidance prescribed under subclause (I).

**[\*11]** As directed by Congress, the Secretary issued regulations specifying the circumstances under which an appraisal will be treated as a "qualified appraisal." *See* Treas. Reg. § 1.170A-13(c)(3). In 2018 the Treasury Department amplified these requirements, effective for contributions made on or after January 1, 2019. *See* Treas. Reg. § 1.170A-17(a), (c). These regulations provide that "a qualified appraisal shall include" (among other things) the following information:

- "The qualifications of the qualified appraiser who signs the appraisal, including the appraiser's background, experience, education, and membership, if any, in professional appraisal associations . . . ." Treas. Reg. § 1.170A-13(c)(3)(ii)(F). This information must include the appraiser's qualifications "to value the type of property being valued." Treas. Reg. § 1.170A-17(a)(3)(iv)(B).

- "The method of valuation used to determine the fair market value, such as the income approach, the market-data approach, and the replacement-cost-less-depreciation approach . . . ." Treas. Reg. § 1.170A-13(c)(3)(ii)(J); *see* Treas. Reg. § 1.170A-17(a)(3)(viii).

- "The specific basis for the valuation, such as specific comparable sales transactions or statistical sampling . . . ." Treas. Reg. §§ 1.170A-13(c)(3)(ii)(K), 1.170A-17(a)(3)(ix).

Petitioners have advanced two arguments in urging that they secured "qualified appraisals." According to AO Matthews, petitioners' counsel took the position during the CDP proceeding "that a Form 8283 was sufficient" and that "no other documentation needed to be provided." Petitioners contended, in other words, that the Forms 8283 attached to the amended return were themselves "qualified appraisals."

This argument is a non-starter. "Form 8283 is the form that the IRS prescribes for an *appraisal summary*." *Savannah Shoals, LLC v. Commissioner*, T.C. Memo. 2024-35, at \*13 (emphasis added). Needless to say, an "appraisal summary" is not the same thing as an "appraisal." The required contents for a "qualified appraisal" are set forth in Treasury Regulation §§ 1.170A-13(c)(3) and 1.170A-17(a). The much more limited requirements for an "appraisal summary" are forth in Treasury Regulation § 1.170A-13(c)(4). The regulations thus make clear that

[*12] an "appraisal" and an "appraisal summary" are distinct documents.[6]

In the Form 8283 "Declaration of Appraiser," the appraiser makes the following attestation: "[B]ecause of my qualifications *as described in the appraisal*, I am qualified to make appraisals of the type of property being valued." (Emphasis added.) This makes it obvious that the Form 8283 is not itself the "appraisal."[7]

Alternatively, petitioners contend that the statements from Messrs. Poutré, Mauro, and Evans, which were supplied to AO Matthews in January 2023, constitute "qualified appraisals." This argument confronts two insurmountable obstacles. First, these documents—each a page and a half long—fail to include critical information that a "qualified appraisal" is required to contain, such as "[t]he method of valuation used to determine the fair market value" and "[t]he specific basis for the valuation." *See* Treas. Reg. §§ 1.170A-13(c)(3)(ii)(J) and (K), 1.170A-17(a)(3)(viii) and (ix). Each document simply asserts that the signatory has industry experience and recites his unsupported opinion as to the "wholesale value" of the items.

Second, these documents are dated January 5 and 6, 2023. The regulations explicitly provide that, "in the case of a deduction first claimed (or reported) on an amended return," a qualified appraisal "must be received by the donor before . . . the date on which the return is filed." Treas. Reg. §§ 1.170A-13(c)(3)(iv)(B), 1.170A-17(a)(4)(iii), (8). Petitioners filed their amended return on October 16, 2020, more than

---

[6] The structure of the statutory substantiation requirements confirms that an "appraisal summary" is not an "appraisal." For property contributions valued in excess of $5,000, but less than $500,000, the taxpayer is required to attach to his return an appraisal summary on Form 8283. *See* § 170(f)(ii)(C); Treas. Reg. § 1.170A-13(c)(4). For property contributions valued in excess of $500,000, Congress enacted the more rigorous requirement that a copy of the appraisal itself *must also* be attached to the return. *See* § 170(f)(11)(D); *Emanouil v. Commissioner*, T.C. Memo. 2020-120, 120 T.C.M. (CCH) 146, 153 ("For deductions in excess of $5,000, the taxpayer must obtain a qualified appraisal of the property [and] attach to the tax return a fully completed appraisal summary (i.e., Form 8283) . . . .").

[7] The relevant portion of Form 8283 is only one page long. It does not ask for, and it has no space for inserting, the substantive information required for a "qualified appraisal." The required information is voluminous: It must include "the appraiser's background, experience, education, and membership . . . in professional appraisal associations," his "[q]ualifications to value the type of property being valued," "[t]he method of valuation used to determine the fair market value," and "[t]he specific basis for the valuation, such as specific comparable sales transactions or statistical sampling." *See* Treas. Reg. §§ 1.170A-13(c)(3)(ii)(F), (J), (K), 1.170A-17(a)(3)(iv)(B).

**[\*13]** two years before the statements from their appraisers were secured.

    C.    *Qualified Appraiser*

Congress has ordained that an appraisal can be a "qualified appraisal" only if it "is conducted by a qualified appraiser in accordance with" regulations prescribed by the Secretary and generally accepted appraisal standards. § 170(f)(11)(E)(i)(II). The statute defines the term "qualified appraiser" to mean an individual who (1) "has earned an appraisal designation from a recognized professional appraiser organization or has otherwise met minimum education and experience requirements set forth in regulations prescribed by the Secretary"; (2) "regularly performs appraisals for which the individual receives compensation"; and (3) "meets such other requirements as may be prescribed by the Secretary in regulations." § 170(f)(11)(E)(ii). "A charitable deduction shall be allowable as a deduction only if verified under regulations prescribed by the Secretary." § 170(a).

For charitable contributions made after January 1, 2019, the Secretary has prescribed regulations defining the "minimum education and experience requirements" that a qualified appraiser must have. § 170(f)(11)(E)(ii)(I). Such an individual must have "verifiable education and experience in valuing the type of property for which the appraisal is performed." Treas. Reg. § 1.170A-17(b)(1). That requirement is met in two circumstances. First, the individual must have "[s]uccessfully completed . . . professional or college-level coursework . . . in valuing the type of property . . . and ha[ve] two or more years of experience in valuing the type of property." *Id.* subpara. (2)(i)(A). Alternatively, the individual must have "[e]arned a recognized appraiser designation . . . for the type of property" for which the appraisal is performed. *Id.* subdiv. (i)(B).

None of the individuals hired by petitioners meets these requirements. Mr. Poutré, the individual who appraised the clothing items, describes himself as the retired owner of the Unique Army Navy Store in Albany, New York. Mr. Mauro, the individual who appraised the cobblestones, describes himself as a project supervisor and estimator for a company that does commercial stonework. Mr. Evans, the individual who appraised the vinyl flooring and adhesive, describes himself as "the operational supervisor" at Discount Flooring Mart in Albany, New York.

None of these individuals avers that he "regularly performs appraisals for which [he] receives compensation." § 170(f)(11)(E)(ii)(II).

**[\*14]** Although each alleges relevant experience, none avers that he has "[s]uccessfully completed . . . professional or college-level coursework . . . in valuing the type of property" being appraised. *See* Treas. Reg. § 1.170A-17(b)(2)(i)(A). Neither Mr. Poutré nor Mr. Mauro avers that he has "[e]arned a recognized appraiser designation . . . for the type of property" being appraised. *See id.* subdiv. (i)(B). And while Mr. Evans alleges that he has been "certified . . . as a floor inspector," he likewise does not allege that "[e]arned a recognized appraiser designation" for that type of property. *See ibid.*

In order to defeat a properly supported motion for summary judgment, "the nonmovant may not rest on the allegations or denials in that party's pleading" but must set forth specific facts, by affidavit or otherwise, showing that there is a genuine dispute for trial. Rule 121(d). Petitioners have set forth no specific facts to show that the individuals who signed the Forms 8283 could meet the standards for a "qualified appraiser" set forth in section 170(f)(11)(E)(ii) and the regulations the Secretary has promulgated at Congress's direction. Finding no material facts to be in genuine dispute on this point, we conclude that, even if the Forms 8283 themselves were thought to be "appraisals," or if the January 2023 statements were thought to be timely secured appraisals, none of these documents would be a "qualified appraisal" because none was prepared by a "qualified appraiser."[8]

---

[8] Petitioners contend that the qualified appraisal requirements "are discretionary, not mandatory, and that the requirements can be satisfied by substantial, rather than strict compliance." We disagree. Several of the requirements in question—e.g., that the taxpayer obtain on actual appraisal and that the appraiser "regularly perform[] appraisals for which [he] receives compensation"—demand strict compliance because they are imposed by the statute itself. *See* § 170(f)(11)(E)(i), (ii)(II). For regulatory requirements under section 170, we have found substantial compliance sufficient where "the requirements are procedural or directory in that they are not of the essence of the thing to be done but are given with a view to the orderly conduct of business." *Bond v. Commissioner*, 100 T.C. 32, 41 (1993) (quoting *Taylor v. Commissioner*, 67 T.C. 1071, 1077–78 (1977)). The regulatory requirements in question here—e.g., that the appraisal contain specified substantive information, that the appraisal be timely secured, and that the appraisers meet minimum educational and professional requirements—are not merely "procedural or directory" but rather go to "the essence of the thing to be done." *Ibid.* (quoting *Taylor*, 67 T.C. at 1077–78); *see, e.g.*, *Hewitt v. Commissioner*, 109 T.C. 258, 264 (1997) (finding no substantial compliance where critical information was missing), *aff'd per curiam*, 166 F.3d 332 (4th Cir. 1998) (unpublished table decision); *Alli v. Commissioner*, T.C. Memo. 2014-15, 107 T.C.M. (CCH) 1082, 1095 (finding no substantial compliance where appraiser was not "qualified").

**[\*15]** D. *Reasonable Cause Defense*

Section 170(f)(11)(A)(i) provides that "no deduction shall be allowed" for any contribution of property valued in excess of $5,000 unless the taxpayer satisfies the qualified appraisal requirements of section 170(f)(11)(C). But Congress created an exception to this rule in section 170(f)(11)(A)(ii)(II). It provides that the disallowance rule "shall not apply if it is shown that the failure to meet such requirements is due to reasonable cause and not to willful neglect." *Ibid.* Petitioners contend that they qualify for this exception.

"Reasonable cause requires that the taxpayer have exercised ordinary business care and prudence as to the challenged item." *Crimi v. Commissioner*, T.C. Memo. 2013-51, 105 T.C.M. (CCH) 1330, 1353 (citing *United States v. Boyle*, 469 U.S. 241 (1985)). "The determination of whether a taxpayer acted with reasonable cause and in good faith is made on a case-by-case basis, taking into account all pertinent facts and circumstances." Treas. Reg. § 1.6664-4(b)(1). We have accordingly held that the applicability of the section 170(f)(11)(A)(ii)(II) defense typically raises factual questions ill-suited to summary adjudication. *See Oakhill Woods, LLC v. Commissioner*, T.C. Memo. 2020-24, 119 T.C.M. (CCH) 1144, 1150–51.

For these reasons, we will grant respondent's Motion for Summary Judgment to the extent he urges that petitioners failed to secure qualified appraisals from qualified appraisers. We will deny his Motion on the questions whether petitioners failed to obtain a CWA and had reasonable cause for failing to obtain qualified appraisals.[9]

To implement the foregoing,

*An appropriate order will be issued.*

---

[9] Respondent also contends that the Forms 8283 attached to petitioners' amended return were inadequate. His arguments in support of that conclusion are largely derivative of his arguments that petitioners failed to secure qualified appraisals from qualified appraisers. We therefore do not consider this argument separately at this stage of the proceedings.